## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS SECURITIES
INTERMEDIARY,

      Plaintiff/Counterclaim-
Defendant,

v.

AMERITAS LIFE INSURANCE
CORP.,

      Defendant/Counterclaim-
Plaintiff.

Civil Action No.
1:23-cv-02097-VMC

## ORDER

This matter is before the Court on Plaintiff/Counterclaim-Defendant Wilmington Trust, N.A.'s ("Plaintiff" or "Wilmington Trust") Motion for Partial Summary Judgment (Doc. 85-1) and Defendant/Counterclaim-Plaintiff Ameritas Life Insurance Corp.'s ("Defendant" or "Ameritas") Motion for Summary Judgment (Doc. 89-1). For the reasons that follow, the Court will stay the case and instead certify three questions to the Supreme Court of Georgia.

## I.    Background

This case involves an action for damages brought by Plaintiff Wilmington Trust with respect to an adjustable life insurance policy issued by Union Central Life Insurance Company, (currently and collectively "Ameritas"), in the amount

of $6 million (the "Policy"). (Doc. 21 ¶ 1). Wilmington Trust alleges that Defendant failed to pay the death benefit due and owing under the Policy, and that the Policy is valid and enforceable under either and both Florida and Georgia law. (*Id.* ¶ 2). In its Answer, Defendant Ameritas brings Counterclaims against Wilmington Trust, alleging that the Policy involves a stranger-originated life insurance ("STOLI") that was manufactured on the life of Jacqueline Leone and is therefore in violation of Georgia's insurable interest laws and public policy. (Doc. 27 at 45).

## A.    Factual Background

The Court derives the following facts from Plaintiff's Statement of Material Facts, ("Pl. SMF," Doc. 87), Defendant's Statement of Material Facts ("Def. SMF," Doc. 90-1), the responses and replies thereto, and this Court's own review of the record.

### i.    Premium Financing Facility—The Peachtree Program

On October 16, 2006, Settlement Funding, LLC d/b/a Peachtree Settlement Funding ("Peachtree") and Barclays Bank PLC ("Barclays"), entered into a "Premium Finance Facility" and, as part of that Facility, a Loan Origination Agreement ("Origination Agreement").[1] (Def. SMF ¶ 2). Under the Origination

---

[1] Citation to the relevant responsive statement without explanation or clarification indicates the Court has deemed the underlying statement admitted. For clarity and ease of reading, the Court omits quotation marks from admitted statements that are reproduced in this Order. Citations to the parties' respective briefs are to the

Agreement, Peachtree was the "Originator" of life insurance policies and Barclays agreed to provide up to $50 million of premium financing to certain life insurance trusts that met the definition of "Eligible Borrower" for the payment of premiums (the "Peachtree Program"). (*Id.* ¶ 3). The Origination Agreement also provided that Peachtree was responsible for originating life insurance policies at its own expense, including (i) locating potential insureds through its agents, (ii) assisting the insured in the execution of the boilerplate documents under the Origination Agreement, (iii) generating at least two life expectancy reports on the insured and (iv) receiving policy illustrations from the insurer. (*Id.* ¶ 4).

Under the Origination Agreement, Barclays agreed to provide up to $50 million in nonrecourse premium finance loans to newly created life insurance trusts. (*Id.* ¶ 5). Peachtree was required to pay Barclays an "unused fee" each month, which was an amount equal to 0.5 percent of Barclays' $50 million commitment that was currently unutilized. (*Id.*). As such, Peachtree was financially incentivized to originate policies in order to mitigate the "unused fee" pursuant to the Origination Agreement. (*Id.* ¶ 6). The Origination Agreement also required that each policy and each loan used the same form transaction documents that could not be altered or amended. (*Id.* ¶ 7).

---

internal pagination, rather than the ECF header stamps, unless indicated otherwise.

3

The boilerplate trust agreement ("Form Trust Agreement") created a new Georgia trust in the insured's name, was nominally funded with $10, and contemplated the ownership of a future life insurance policy in the insured's name. (*Id.* ¶ 8). Only Ken Shapiro and Michael Braun could serve as trustees of the new Georgia trusts under the Origination Agreement. (*Id.* ¶ 9). According to the Form Trust Agreement, the intent of both the insured and trustee was that the insured never own or control the policy, and the insured disclaimed and relinquished all rights and powers in such policy which ensured that the insured could not jeopardize the investors' rights to the policy. (*Id.* ¶¶ 10, 11).

The Barclays' premium finance loans were for a term of twenty-four (24) months. (*Id.* ¶ 12). The Barclays premium finance loans made to the trusts were nonrecourse to the insured. (*Id.* ¶ 13; Doc. 89-6 ¶ 3). The trust's assets were insufficient to pay off the balance of the loan. (Doc. 90-1 ¶ 14). During the term of the loans, Peachtree also acted as the servicer of the loans and the policies under the Servicing Agreement. (*Id.* ¶ 16). Under the terms of the Servicing Agreement, Peachtree was not separately compensated for servicing the policies or the loans. (*Id.* ¶ 17). During the term of the loans, Peachtree, and not the trust, was required to make monthly interest payments to Barclays as a "Usage Fee" under the Origination Agreement. (*Id.* ¶ 18). There were no cure periods in the Form Loan Agreement, and therefore the loans automatically went into default at maturity.

(*Id.* ¶ 19). After the loan matured, Peachtree was required to make a minimum bid for the full amount of principal and interest owed by the trusts. (*Id.* ¶ 20). Even if Peachtree did not make that payment, Peachtree would acquire the rights to the policy within 60 days of the loan's default. (*Id.* ¶ 22). Peachtree ultimately acquired all of the policies that were funded by Barclays under the Origination Agreement. (*Id.* ¶ 24). The policies originated under the Origination Agreement were created as investment vehicles for the benefit of investors. (*Id.* ¶ 25).

### ii.  The Leones Apply for Life Insurance

In 2006, Chris Feery, an insurance agent, marketed the Peachtree Program, referenced above, as cost-free and risk free because all premiums would be paid by a third-party investor through a nonrecourse premium finance loan.[2] (Def. SMF ¶ 26; Doc. 86-2 at 10). Mr. Feery promised the insured parties free insurance for two years and the possibility of financial compensation in order to induce them to participate.[3] (Def. SMF ¶ 27; Doc. 86-2 at 10).

---

[2] In response to Def. SMF ¶ 26, Wilmington Trust argues that the statement in Paragraph 26 is based on a witness declaration by Richard Karlton that did not relate to the Policy, and that Mr. Karlton testified in a deposition that he does not know what occurred in 2006 regarding Mr. and Mrs. Leone or the Policy. (Doc. 102-1 at 5–6). But this statement relates to Mr. Feery's general practices in 2006 about which Mr. Karlton did have personal knowledge, not to Mr. and Mrs. Leone. (*See* Doc. 86-2 at 9–10). Thus Def. SMF ¶ 26 is deemed admitted.

[3] Again, Wilmington Trust argues that the statement in Paragraph 27 is based on a witness declaration that did not relate to the Policy and Mr. Karlton testified in a deposition that he does not know what occurred in 2006 regarding Mr. and Mrs.

In 2006, Jacqueline Leone (the "Insured") and her husband, William A. Leone, were living in Miami, Florida. (Pl. SMF ¶¶ 1–2; Doc. 92-5 at 6). At some point not borne out by the record, the Leones and Mr. Feery got into contact regarding the Peachtree Program.[4] (Doc. 86-6 at 8). In the latter half of 2006, the Insured and her husband began the trial application process. (Pl. SMF ¶ 2; Doc. 86-6 at 10). In connection with the application for insurance, on September 29, 2006, the Insured underwent a medical examination in Miami, Florida. (Pl. SMF ¶ 10). The Insured and her medical professional signed the Insurer-issued "Part II-Medical" portion of the life insurance application in Florida on September 29, 2006. (*Id.* ¶ 11). The "Part II-Medical" insurance application form dated September 29, 2006 was a portion of the subject life insurance application that addresses a proposed insured's medical history, and was required by Insurer in order to issue the subject policy. (*Id.* ¶ 13). The Insured's husband also applied for life insurance when the Insured did, but Ameritas determined that her husband was "uninsurable" in October 2006. (*Id.* ¶ 14). In October and November 2006 and in accordance with its obligations as the Originator under the Origination

---

Leone or the Policy. Since the statement in Paragraph 27 does not relate to Mr. and Mrs. Leone, but rather to Mr. Feery's general practices in 2006 about which Mr. Karlton did have personal knowledge, the dispute similarly does not address the facts described. (*See* Doc. 86-2 at 9–10). Thus Def. SMF ¶ 27 is deemed admitted.

[4] Precisely how or when these parties came into contact is unknown.

Agreement, Peachtree requested and obtained two life expectancy reports on Mrs. Leone's life. (Def. SMF ¶ 29). Further, in connection with financial underwriting for the proposed policy, the Insured and her husband provided their financial information to Ameritas and underwent a telephone interview. (Pl. SMF ¶ 15).

Bradley Gee and Mr. Feery were Insurer's insurance agents who ultimately sold the policy to the Leones. (Doc. 86-6 at 9). They worked with an insurance agency called "The Virtual Group," whose office was located in Pennsylvania. (Pl. SMF ¶ 16). Mr. Gee was licensed and resided in Florida. (*Id.* ¶ 17). Mr. Feery was licensed and resided in Florida and conducted his insurance business from Florida. (*Id.* ¶ 18). On October 6, 2006, Union Central Life Insurance Company, a predecessor to Defendant Ameritas, received an informal request for a $9 million policy on the Insured's life from Tim Gresge, a co-agent with Chris Feery.[5] (Def. SMF ¶ 30). Following medical and financial underwriting for the subject policy, Ameritas issued a universal life insurance policy on February 1, 2007 for the Insured under policy number U000036824, in the face amount of $6,000,000 (the "Policy"). (*Id.* ¶ 19).

---

[5] In its Response, Wilmington Trust argues that sometime prior to October 26, 2006, the Insured and her husband submitted preliminary insurance applications to the Insurer for $9,000,000 of life insurance each, but the Insured's husband was rejected because of his health. While the record does bear this out, Wilmington Trust does not contradict, or even dispute the statement in Paragraph 30. As such, Def. SMF ¶ 30 is deemed admitted.

7

### iii.  The Jacqueline Leone Irrevocable Trust

On November 28, 2006, the Jacqueline Leone Irrevocable Trust (the "Trust") was formed with a situs in Atlanta, as required by the Origination Agreement.[6] (Def. SMF ¶ 31). The Trust Agreement was executed on Peachtree's Form Trust Agreement, which was required to be signed as-is. (*Id.* ¶ 32). The trustee of the Trust was Ken Shapiro, one of the two "Eligible Trustees" under the Origination Agreement. (*Id.* ¶ 33). Under the Origination Agreement and the Loan Agreement, Peachtree required that the beneficiary of the Trust be a family member or someone with insurable interest in the life of the insured. (*Id.* ¶ 34). As such, the beneficiary of the Trust was the Insured's husband, William Leone. (*Id.*). The Trust documentation indicated that Mrs. Leone was supposed to transfer $10 as the grantor per the Trust Agreement. (*Id.* ¶ 35). In signing the Trust Agreement, Mrs. Leone expressly waived all rights and powers with respect to the trust.[7] (*Id.* ¶ 38).

---

[6] In response to Def. SMF ¶ 31, Wilmington Trust writes that the statement is disputed in part as a mischaracterization, but does not dispute the substance of the statement. If a statement is disputed by the substance of Wilmington Trust's response, the Court will treat the statement as disputed. But, if the statement is not disputed by Wilmington Trust's response, and merely requires additional context, then it is deemed admitted.

[7] Wilmington Trust argues that there is no evidence that Peachtree required Mrs. Leone to act or not act in a certain way because there is no evidence that Peachtree interacted with Mrs. Leone or her husband in September or October or 2006. It is undisputed however, that the Trust Agreement provided that the signatory "expressly waives all rights and powers…to alter, amend, revoke, or terminate the

The Trust Agreement also explicitly stated that the intent of Mrs. Leone and Mr. Shapiro was that Mrs. Leone never own or possess the Policy, and that Mrs. Leone disclaimed her right to ever own or control the Policy. (*Id.* ¶ 39).

On December 20, 2006, Mr. Shapiro and the Trust applied for a premium financing loan from Barclays. (*Id.* ¶ 40). On January 4, 2007, Ameritas received a formal application for a $6 million dollar policy on Mrs. Leone's life whereby Mr. Shapiro, as trustee on behalf of the Trust, was the policyowner and beneficiary. (*Id.* ¶ 41). The Policy's application was signed in Atlanta, Georgia.[8] (*Id.* ¶ 42). On January 16, 2007, Ameritas received the Trust Agreement for the Trust with Mr. Shapiro as trustee. (*Id.* ¶ 43).  On January 19, 2006, Ameritas asked "[c]an you tell me what is the relationship of the trustee to the client" via an email that was forwarded to Chris Feery. (*Id.* ¶ 44). Mr. Feery responded that Mr. Shapiro was Mrs. Leone and her husband's "accountant and trusted advisor." (*Id.*). Mr. Shapiro

---

terms of this Trust." (*See* Doc. 89-14). As such, the Court deems Def. SMF ¶ 38 admitted insofar as it correctly quotes the relevant portion of the Trust Agreement.

[8] In response to Def. SMF ¶ 42, Wilmington Trust argues that "Part II-Medical" of the Policy's application was signed in Miami, Florida by the Insured and physician Mayra Diaz. The Application cited thereto explicitly states that it was signed in Atlanta, Georgia on January 4, 2007 in two separate places. (Doc. 89-15 at 16, 18). Further, Mr. Shapiro, a signatory to the Application, testified that he executed all of the documents on behalf of the Leone Trust in Atlanta, Georgia. (Doc. 89-10 at 6). Further, when counsel asked Joe Leone, "[d]o you know if your parents either together or separately ever traveled to Georgia," he responded "I do not know." (Doc. 86-1 at 17). This is insufficient to cause a fact dispute. Thus, the Court deems Def. SMF ¶ 42 admitted.

testified that he had never met or spoken to Mrs. Leone and did not know anyone in the Leone family. (*Id.* ¶ 45).

Consistent with Ameritas' STOLI prohibition and related requirements, Mr. Feery and Mrs. Leone executed a Statement of Policyowner and Agent Intent form, which Ameritas received on January 23, 2007. (*Id.* ¶ 50). One Statement of Intent, executed by Mrs. Leone and Mr. Feery on January 19, 2007, denied that a loan would be used to pay the premiums and denied that the owner had spoken to an individual offering "free" or "no cost" insurance. (*Id.*; *see* Doc. 89-16 at 2). But another Statement of Intent executed by Mrs. Leone on January 22, 2007, and Mr. Shapiro as the Trust's trustee on February 27, 2007, did indicate that a loan agreement with Barclays would be executed in connection with the transaction. (Doc. 89-31 at 2). On January 24, 2007, Ameritas approved the application. (Def. SMF ¶ 54). The next day, Ameritas sent a policy to the producer's office for delivery. (*Id.* ¶ 55). The Leone Policy was issued as a Georgia policy on Georgia Policy Form UC 8706 GA, with an original issue date of February 1, 2007.[9] (*Id.* ¶ 56; 89-22 at 8). On February 28, 2007, the Policy at issue in this litigation was reissued. (Def. SMF ¶ 56). In his statement and deposition, Mr. Shapiro confirmed that all Policy documents (including the application and delivery receipt, which

---

[9] In response to Def. SMF ¶ 56, Wilmington Trust argues that the Policy was not effective until the Insurer received the initial premium. Paragraph 56 does not make reference to the effective date. As such, Def. SMF ¶ 56 is deemed admitted.

confirms delivery of the Policy) were signed by him in Atlanta, Georgia. (Def. SMF ¶ 58).

### iv.  The Nonrecourse Loan

On February 16, 2007, the Insured and her husband executed a Disclosure Statement, Representations and Warranties, and Consent, in connection with a Loan and Security Agreement to pay for the Policy premiums with the assistance of attorney Ian Chaikin. (Pl. SMF ¶ 28; Def. SMF ¶ 46; Doc. 89-7 ¶ 23). Mr. Chaikin testified that he did not personally know Mrs. Leone, Mr. Leone, or anyone in the Leone family, until he was referred by Peachtree to act as the Leones' counsel. (Doc. 89-7 ¶ 23).

On February 28, 2007, the Trust, as Borrower, entered into a Loan and Security Agreement with Barclays Bank PLC, as Lender in order "to borrow certain funds from Lender, which funds shall be used to pay the premium due…for not less than the first two (2) years on the Policy" (the "Loan"). (Pl. SMF ¶ 29). The Loan Agreement was executed on Peachtree's boilerplate Loan Agreement, which could not be altered or amended. (Def. SMF ¶ 60). In order to secure the Trust's repayment and performance obligations with respect to the Loan, the Trust granted a lien in favor of Barclays of all of the Trust's assets and collaterally assigned the Policy to Barclays' Collateral Agent. (Pl. SMF ¶ 29). The principal amount of the Loan was $375,276.67. (*Id.*). The initial premium payment

was made on February 28, 2007. (Doc. 89-30). The Loan matured in two years. (Def. SMF ¶ 61).

Although there was an option for the Trust to extend the Loan for a third year, Mr. Shapiro testified that, under the Peachtree Program in which he was a designee, he did not recall a single occurrence where an insured reached into their own pocket and paid to extend the loan for a third year in the thirty to forty insurance trusts for which he served as a trustee. (*Id.*). Mrs. Leone was not a signatory to the Loan Agreement, and she was not responsible for paying any premiums.[10] (*Id.* ¶ 62; *see* Doc. 90-9 at 13). The Loan was nonrecourse as to Mrs. Leone and only recourse as to the Trust's nominal assets.[11] (Def. SMF ¶ 63). But the Trust had no financial ability to repay the Loan, making the Loan nonrecourse. (*Id.* ¶ 65; *see* Doc. 89-46 at 5). Moreover, the Trust could not have satisfied its obligations under the Loan without Barclays calculating the interest and fees due, because the interest due was dependent on the lender's calculation of LIBOR

---

[10] Wilmington Trust disputed Def. SMF ¶ 62 on the grounds that Mrs. Leone and her husband executed documents accompanying the Loan and Security Agreement, including the Disclosure Statement and Consent form. Since Paragraph 62 references only the Loan Agreement, and since Mrs. Leone was not a party to said agreement, the Court deems Def. SMF ¶ 62 admitted.

[11] In response to Def. SMF ¶ 63, Wilmington Trust disputes "as to characterization" and provides an excerpt from the Williams Deposition admitting that the loan is called a "nonrecourse loan." (Doc. 102-1 at 16–17). Since this excerpt corroborates the substance of Paragraph 63, the Court deems Def. SMF ¶ 63 as admitted.

under the Loan Agreement, and the Loan could not contractually be partially prepaid. (*Id.* ¶ 66). Neither Barclays nor Peachtree ever calculated the total amount due on the Loan, which would have included principal, interest, and an undisclosed amount of fees. (*Id.* ¶ 67). Mr. Shapiro testified that the loans were never repaid by the trusts or the insured. (*Id.* ¶ 68). There was no cure period under the terms of the Loan, and an event of default occurred automatically and immediately on the maturity date. (*Id.* ¶ 69).

On February 28, 2007, the same day that the Loan Agreement was executed and the Policy issued, an Assignment of Life Insurance Policy as Collateral was executed whereby the Trust, as borrower and assignor, assigned all of its rights and interests in the Policy to Barclays, as lender and assignee ("Collateral Assignment"). (*Id.* ¶ 70). Under the Collateral Assignment, Barclays had the "sole right" to collect the death benefits, surrender the Policy, further assign the Policy, and request that the insurer amend the Policy, since the first day that the Policy was issued. (*Id.* ¶ 71). The only right Mrs. Leone maintained was that Mr. Leone could have potentially received a portion of the death benefits if Mrs. Leone passed away during the first two years. (*Id.* ¶ 72). But as a condition for funding the Loan, Peachtree was required to obtain pre-issuance life expectancy reports on Mrs. Leone indicating that she would survive at least 36 months but not more than 180 months. (*Id.* ¶ 73). Peachtree calculated that there was a 98.7% chance that Ms.

Leone would not die during the two-year Loan term. (*Id.* ¶ 74). Mr. Shapiro further testified that he could not recall a single time that the beneficiary of a Peachtree trust received a policy's proceeds. (*Id.* ¶ 75). Mrs. Leone's "Insured Designation of Contacts" form designated Ric Pertierra, a purported "Friend" of Mrs. Leone, as one of her contacts. (*Id.* ¶ 77). However, Mr. Pertierra testified that he "did not personally know Ms. Leone, her husband, or anyone in the Leone family." (*Id.* ¶ 78). Mr. Pertierra testified that he was a former colleague of Bradley Gee, Mrs. Leone's other designated contact. (Doc. 89-29 ¶ 6). Mr. Pertierra further testified that his signature on the Designated Contact form was forged. (*Id.* ¶ 5; *see* Def. SMF ¶ 80).

### v. Peachtree Acquires the Rights to the Policy

On February 27, 2009, two years after the Loan was issued and following the Loan's two-year contestability period, the Loan matured and automatically went into default. (*Id.* ¶ 86). On March 2, 2009, New Age Capital ("New Age"), a Peachtree entity, purchased the rights to the Policy from Barclays and Barclays assigned its rights under the Loan Documents to New Age for $441,553.04, which were the principal and interest due on the loan. (*Id.* ¶ 87). Barclays provided no representations or warranties regarding the validity of the Policy when it sold it to Peachtree, and Peachtree's pre-acquisition diligence was limited to obtaining additional life expectancy reports. (*Id.* ¶ 88). There is no evidence to suggest that

Mrs. Leone or her family received any compensation from the Peachtree assignment or subsequent sales of the Policy. (*Id.* ¶ 89). Peachtree, as successor to Barclays under the Loan Agreement, did not communicate the amount due under the Loan to the Trust, the intended borrower. (*Id.* ¶ 90).

On March 26, 2009, the Trust received a notice of default from Peachtree Settlement Funding, as servicer for New Age (the "Notice"). (*Id.* ¶ 91). The Notice did not calculate the principal, interest, default interest, or applicable fees under the Loan Agreement. (*Id.* ¶ 92). Instead, the Notice demanded that the Trust acknowledge default and relinquish the Policy by signing a document called "Trust Acknowledgment of Default and Lender Rights." (*Id.* ¶ 92). On May 19, 2009, the Trust signed the Trust Acknowledgment of Default and Lender Rights documents and relinquished the Policy to New Age. (*Id.* ¶ 93).

### vi. Wilmington Trust's Acquisition of the Policy

Following Peachtree's acquisition of the rights to the Policy, the Policy changed hands a number of times until Wilmington Trust became the record owner on May 23, 2019 on behalf of BMJ Capital, the beneficial owner of the Policy. (*Id.* ¶ 97). On December 23, 2021 National Founders LP ("Founders") purchased the Policy in a portfolio of policies from BMJ Capital, pursuant to a Purchase and Sale Agreement ("PSA"). (*Id.* ¶ 98). In the PSA, Founders purported to purchase the right to recover the premiums paid by prior owners (including BMJ Capital)

only to the extent those premiums carried the Policy after November 15, 2021, among other things. (*Id.* ¶ 99; *see* Doc. 90-17 at 13). During Founders' pre-acquisition diligence, Founders noted that the Policy was subject to a nonrecourse premium finance loan that appeared to have been originated through manufactured paper.[12] (*Id.* ¶ 100; *see* Doc. 90-18 at 3). Founders' agent, Institutional Life Services (ILS), which assisted in factual and legal diligence, concluded that the Policy carried a risk grade of "C" because it carried "a risk of carrier challenge." (*Id.* ¶ 101; *see* Doc. 90-19 at 2). Founders did not call the family, the trustee, or anyone involved in the transaction to ensure the policy was taken out for a bona fide insurance purpose. (*Id.* ¶ 102; Doc. 89-25 at 4). Founders further conceded that it wanted and advocated for a much stronger insurance interest representation from the seller, but the seller was unwilling to provide any substantive representation. (Def. SMF ¶ 103; Doc. 89-25 at 8).

### vii.  Wilmington Trust Submits Death Claim

Mrs. Leone died on November 23, 2022. (Doc. 21 ¶ 40). On December 5, 2022, Ameritas received notice of her death from ILS, the Founders' representative. (Def. SMF ¶ 108). On December 12, 2022, Caleb Meyers, Senior Life Claims Examiner, referred the claim to Andrea Snowden, Assistance General Counsel, for a legal

---

[12] Wilmington Trust disputes this fact. However, it cites to two portions of irrelevant deposition testimony to attempt to create a fact dispute where there is none. As such, the Court deems Def. SMF ¶ 100 admitted.

opinion on a large death claim (over $1 million) with potential STOLI criteria. (*Id.* ¶ 109). The death claim was sent for investigation and review to Ameritas' outside legal counsel which informed the legal department that the Policy was probably a STOLI and made a recommendation not to pay. (Doc. 101-8 at 6).

**B.    Procedural History**

On March 21, 2023, Ameritas commenced an action against Wilmington Trust in the United States District Court for the District of Nebraska, contesting the Policy's validity. (Doc. 21 ¶ 42). On May 10, 2023, Wilmington Trust filed the instant action against Ameritas, seeking damages for breach of contract and bad faith conduct, or in the alternative, the return of all premiums paid in connection with the Policy. (Doc. 1 ¶ 4). On June 14, 2023, Ameritas withdrew its complaint in the Nebraska action and agreed to dismiss the lawsuit without prejudice. (Doc. 21 ¶ 45). Wilmington Trust filed its Amended Complaint on July 6, 2023 adding a claim for attorney's fees pursuant to O.C.G.A. § 13-6-11. (Doc. 21).

The Parties filed their Joint Preliminary Report and Discovery Plan on August 17, 2023, and the Court issued a scheduling order. (Docs. 28, 29). During discovery, Wilmington Trust claimed to have discovered evidence that certain "indications and representations" were made by Ameritas, upon which Wilmington Trust's customers relied. (Doc. 57-1 at 5). As a result, Wilmington Trust sought to file a Second Amended Complaint to add a cause of action for

promissory estoppel pursuant to O.C.G.A. § 13-3-44 against Ameritas. Additionally, Wilmington Trust sought judgment on the pleadings related to the Policy's conformity clause and Ameritas' alleged failure to return premiums paid on the Policy. (Doc. 38). The Court denied both, explaining first that judgment on the pleadings was not warranted, and second that Wilmington Trust's proposed amendment to add a promissory estoppel claim would be futile. (Doc. 84). Wilmington Trust and Ameritas then filed Motions for Summary Judgment, which are now ripe for review. (Docs. 85, 89).

## II. Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260

(11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

On cross-motions for summary judgment, "[t]he standard of review . . . does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed." *Loiseau v. Thompson, O'Brien, Kemp & Nasuti, P.C.*, 499 F. Supp. 3d 1212, 1219 (N.D. Ga. 2020) (quoting *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Cross-motions may . . . be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* (citing *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013)).

## III. Discussion

### A. Law Governing the Policy

Prior to separately addressing the parties' claims, the Court must determine which state's law should be applied in interpreting the relevant policy agreements. In a diversity action, a federal district court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941); *Wammock v. Celotex Corp.*, 835 F.2d 818, 829 (11th Cir. 1988); *Harris v. City of Chattanooga*, 507 F. Supp. 374, 376 (N.D. Ga. 1981). Since Georgia is the forum state, Georgia's choice of law rules govern this diversity action. *Am. Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830, *reh'g denied*, 892 F.2d 89 (11th Cir.1989). Georgia law treats insurance as "a matter of contract" so that "the parties

to the contract of insurance are bound by its plain and unambiguous terms." *Cont'l Cas. Co. v. Winder Lab'ys, LLC*, 73 F.4th 934, 941 (11th Cir. 2023) (quoting *Lima Delta Co. v. Glob. RI-022 Aerospace, Inc.*, 789 S.E.2d 230, 233 (Ga. Ct. App. 2016)). For contract cases, "Georgia follows the traditional rule of *lex loci contractus.*" *McGill v. Am. Trucking & Transp., Ins. Co.*, 77 F. Supp. 3d 1261, 1264 (N.D. Ga. 2015). Pursuant to this doctrine, "contracts are governed by the law of the place where they were made." *Id.* (internal quotations omitted). A contract is made in "the place where the last act essential to the completion of the contract was done." *Shorewood Packaging Corp. v. Com. Union Ins. Co.*, 865 F. Supp. 1577, 1578 (N.D. Ga. 1994) (internal quotations omitted). When the "last act" occurred in another state, Georgia's choice-of-law rules "limit the application of [that] jurisdiction's laws to statutes and decisions construing those statutes." *Trusted Data Sols., LLC v. Kotchen & Low, LLP*, No. 1:14-cv-1419, 2015 WL 11251959, at *3 (N.D. Ga. Feb. 6, 2015) (collecting cases). Thus, "when no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law." *Id.* In this case, Ameritas issued the Policy for delivery in Georgia, and the Policy was delivered in Georgia to a Georgia trust.[13] (*See* Doc. 89-15 at 18 (identifying Atlanta-based

---

[13] Ameritas conducts a full conflict of laws analysis. (See Doc. 90 at 30). Ameritas, however, concludes that there is ultimately no conflict between the laws of Georgia and Florida. As such, Ameritas and Wilmington Trust proceed under the assumption that Georgia law applies. If the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies.

Trust as the owner)). Thus, Georgia law will govern any needed interpretation of the underlying insurance contract.

## B.    The Parties' Contentions

In its Motion for Partial Summary Judgment, Wilmington Trust contends that summary judgment is warranted on its first cause of action for breach of contract because the Policy was valid and enforceable under Georgia law. To support this contention, Wilmington Trust puts forth two arguments: (1) the Policy was not procured or caused to be procured upon the Insured, and (2) the Policy was supported by an insurable interest at issuance. This is because, Wilmington Trust contends, Mrs. Leone was not an "innocent instrumentality," nor was she "merely a pawn" because she "actively participated" in applying for the Policy by submitting to a medical examination and signing part of the Application in September 2006. (Doc. 85-1 at 13). Further, she submitted the required financial information to Insurer and participated in a telephone interview to verify the information. (*Id.*). Mrs. Leone did this with the assistance of her husband William, who their son characterized as "the financial guy" in their relationship. (*Id.*). Finally, because the Policy's beneficiary was a Trust, the beneficiary of which was

---

*Bahama Sales Assocs., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012). Thus, the Court need not spend additional time determining the existence of conflicts or lack thereof.

Mr. Leone, Wilmington Trust asserts that there was plainly an insurable interest in Mrs. Leone's life. (*Id.* at 16).

In its cross Motion for Summary Judgment, Ameritas argues that the Policy issued by its predecessor on the life of Mrs. Leone was procured or caused to be procured by third-party investors who lacked an insurable interest in the insured. (Doc. 90 at 9). As such, Ameritas argues that the Policy is void ab initio under Georgia law. (*Id.* at 35). Ameritas contends that Peachtree, through the Peachtree Program explained at length in the preceding paragraphs, caused the Policy to be procured under the Origination Agreement. (*Id.* at 37). Barclays initially funded the premiums through a two-year nonrecourse premium finance Loan. (*Id.*). Peachtree was responsible for paying monthly interest to Barclays, not the Trust, which was the actual borrower of the Loan. (*Id.*). Further, upon Loan maturity, Peachtree was ultimately responsible for paying back the full amount of the Loan under the Origination Agreement. (*Id.*). Mrs. Leone and her family neither paid, nor were responsible for paying any of the premiums and therefore, Ameritas contends, Peachtree and Barclays caused the Policy to be procured by funding the premiums from outset. (*Id.*).

To support its theory, Ameritas relies on Georgia case law predating the 1960 insurance code, holding that the determination of who procures a policy turns on who funds the premiums to originate the policy. (Doc. 90 at 28 (citing

*Union Fraternal League v. Walton*, 34 S.E. 317 (Ga. 1899) (an insured procured a policy where he "acted for himself" and paid premium "at his own expense"); *Guar. Life Ins. Co. v. Graham*, 199 S.E. 829, 830 (Ga. Ct. App. 1938) (ruling that policy was invalid human life wager where third party lacking insurable interest procured the policy by paying the policy premiums); *Cherokee Life v. Banks*, 82 S.E. 597, 599 (Ga. Ct. App. 1914) ("[I]t is not necessary that an insurable interest be shown to exist where the policy is obtained and the premiums are paid by the insured himself."); *Johnson v. Knights of Pythias*, 80 S.E. 213, 214 (Ga. Ct. App. 1913) ("[O]ne who procures insurance on his own life and himself pays the premiums may fix an insurable interest in his life in any one whose interest he desires.")).

Ameritas also conducted a brief survey of other courts throughout the country, which have similarly held that a third party causes a policy to be procured when it pays the premiums from the outset. (Doc. 90 at 28 (citing *PHL Var. Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069–70 (Del. 2011)("[I]f a third party funds the premium payments by providing the insured the financial means to purchase the policy then the insured does not procure or affect the policy."); *Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A.*, No. 17 C 06588, 2020 WL 1503641, at *14 (N.D. Ill. Mar. 30, 2020), *aff'd in part, rev'd in part*, 44 F.4th 1024 (7th Cir. 2022) (under Illinois law, third parties paid the premiums through a premium finance loan, and therefore, procured the policy); *Sun Life Assurance Co. of Can. v.*

24

*Wells Fargo Bank, N.A.*, 208 A.3d 839 (N.J. 2019) (under New Jersey law, a policy procured with the intent to benefit third parties from the outset is not procured by the insured)).

Alternatively, Ameritas argues that even if the Court were to look beyond the premium payments to determine who truly procured the Policy, the result would remain the same. (*Id.* at 30 n.7). Since Peachtree acted as the "Originator" of the Policy under the Origination Agreement and was responsible for the entire origination process. Peachtree also acted as the Loan's and Policy's servicer during the Loan's term, and paid interest to Barclays on the Loan every month—even though it was not a party to the Loan Agreement. (*Id.*). Then, when the Loan matured, Peachtree was contractually granted the Policy's rights under the Origination Agreement. Thus, Ameritas maintains that Peachtree controlled the Policy from day one and caused it to be procured under any interpretation of the statute. (*Id.*).

Further, Ameritas contends that the proper inquiry when a life insurance policy is trust-owned, is whether the trust has an insurable interest through its trustee, not whether a trust beneficiary has insurable interest. For support, Ameritas cites to *PHL Variable Ins. Co. v. Bank of Utah*, 28 A.3d 1059, 1078 (Del. 2011), holding the same. Since the trustee, Mr. Shapiro, did not know and never

spoke to Mrs. Leone or anyone in her family at any point, Ameritas contends that the Trust could not have an insurable interest in Mrs. Leone's life. (Doc. 90 at 39).[14]

## C.   Georgia Law on Life Wagering Contracts

Like many other states, Georgia prohibits wagering contracts because such contracts are deemed contrary to public policy. *See* O.C.G.A. § 13-8-2(A)(4) ("Contracts deemed contrary to public policy include but are not limited to[]…[w]agering contracts…."). "In the context of life insurance, insuring another in whose life the beneficiary has no insurable interest, is void from its inception, being a wagering contract against public policy." *Wilson v. Progressive Life Ins. Co.*, 7 S.E.2d 44, 44–45 (Ga. Ct. App. 1940) (citing *West v. Sanders*, 31 S.E. 619 (1898)). Because a contract is void *ab initio*, or from its inception, it "amounts to no contract at all" and "cannot be perfected or vitalized by performance." *Id.* at 45.

---

[14] Ameritas puts forth a number of other arguments not pertinent for the Supreme Court's determination of the statutory questions. Ameritas argues that to the extent Peachtree feigned compliance with the insurable interest statute, courts still must scrutinize the transaction as a whole to determine whether it a "cover for a wager." (Doc. 90 at 41 (quoting *Exchange Bank v. Loh*, 31 S.E. 459 (Ga. 1898)). Ameritas also argues that Wilmington Trust is only entitled to a refund of the premium it paid, rather than the premium paid by all prior owners. And finally, Ameritas argues that it is entitled to summary judgment on Wilmington Trust's bad faith claim because: the Policy is void; Ameritas had a reasonable basis to challenge the validity of the Policy, and Ameritas was under no obligation to challenge the Policy's validity earlier. Since the ultimate determination of these issues hinges on the question of the Policy's validity, the Court will address these arguments after the Supreme Court considers the questions certified.

"A STOLI policy is a speculative investment device that entails gambling on the lives of the elderly." *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1207–08 (11th Cir. 2015). Recently, the Eleventh Circuit described the mechanics of a STOLI scheme:

> "A speculator secures an agreement with a person, who is usually elderly, authorizing the speculator to buy insurance on that person's life. The speculator usually gets the policy in the largest amount available and pays the premiums, hoping to profit in one of two ways. One way is if the insured dies before the premiums paid exceed the death benefit. Under that scenario, the sooner the insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater return on investment. The other way the speculator can profit is by selling the policy to another speculator for more than the premiums paid up to the point of that sale. "

*Estate of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186, 1194 (11th Cir. 2020) (quoting *Scarrietta*, 778 F.3d at 1208). "To induce the senior to participate, the stranger may fund the policy premiums and may even pay compensation to the senior." *Id.* at 1194 (quoting *Columbus Life Ins. Co. v. Wells Fargo Bank*, No. C.A. No. 20-833-MN-JLH, 2021 WL 106919, at * 2 (D. Del. Jan. 12, 2021)). Recognizing the perverse incentives of the STOLI scheme, Georgia enacted legislation that seeks to prevent STOLI transactions by requiring the purchasers to have an "insurable interest" in the life of the insured. *Scarrieta*, 778 F.3d at 1208 (referencing O.C.G.A. § 33-24-3). An "insurable interest," in the context of personal insurance, is an interest that is based on a "reasonable expectation of pecuniary advantage through

the continued life, health, or bodily safety of another person and consequent loss

by reason of such person's death or disability or substantial interest engendered

by love and affection in the case of individuals closely related by blood or by law."

O.C.G.A. § 33-24-3(a) (2006).[15]

Georgia law interprets "insurable interest" broadly when an individual

seeks to purchase insurance on her own life. *See, e.g.*, *Crum v. Jackson Nat'l Life Ins.*

*Co.*, 880 S.E.2d 205, 209 (Ga. 2022).

> An individual has an unlimited insurable interest in his
> or her own life, health, or bodily safety and may lawfully
> take out a policy of insurance on her or her own life,
> health or bodily safety and have the policy made payable
> to whomsoever such individual pleases, regardless of
> whether the beneficiary designated has an insurable
> interest.

O.C.G.A. § 33-24-3(b) (2006). The insurable interest in one's own life applies

regardless of intent: "a life insurance policy taken out by the insured on his own

life with the intent to sell the policy to a third party with no insurable interest, but

without a third party's involvement when the policy was procured, is not void as

an illegal wagering contract." *Crum*, 880 S.E.2d at 206 (interpreting identical

statutory language in O.C.G.A. § 33-24-3(b) (1995)).

---

[15] A policy is to be construed according to the statutory language in effect at the time the policy was issued. *Crum v. Jackson Nat'l Life Ins. Co.*, 880 S.E.2d 205, 209 (Ga. 2022).

Purchases involving third parties are more restricted. "Any personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(e). The insurable interest "must exist at the time the contract of life insurance becomes effective but need not exist at the time the loss occurs." *Crum*, 880 S.E.2d at 209 (quoting O.C.G.A. § 33-24-3(d) (1995)).

Despite the clear statutory mandate deeming wagering contracts contrary to public policy generally, courts in Georgia have not had an opportunity to address the precise contours of an unlawful STOLI claim under Georgia law. Nor have courts in Georgia, more specifically, defined the extent to which actions by another give rise to a violation of O.C.G.A. § 33-24-3(i) (2006).

A couple of courts have touched on the prohibition. In *Burton v. John Hancock Mutual Life Insurance Company*, the Court of Appeals of Georgia addressed "procured or caused to be procured" within the context of Code Ann. § 56-2404(4), an older version of O.C.G.A. § 33-24-3. 298 S.E.2d 575, 577 (Ga. Ct. App. 1982). The *Burton* court was called upon to determine whether Georgia law recognized a cause of action for wrongful death based on an insurance company's alleged breach of duty to exercise reasonable care in the issuance of a life insurance policy.

29

*Id.* There, John Hancock Mutual Life Insurance Company issued a life insurance policy to the deceased for $200,000 on March 16, 1979. That same day, the deceased changed the beneficiary under the policy from her daughter, Ava Marie Burton (administratrix of her deceased mother's estate), to Willie S. Adams. *Id.* On May 18, 1979, the deceased was murdered. *Id.* Adams was convicted of the murder and sentenced to life imprisonment. *Id.*; *see also Adams v. State*, 269 S.E.2d 11 (Ga. 1980). In determining whether appellants' cause of action could be maintained, the court evaluated the language of the relevant predecessor statute. *Burton*, 298 S.E.2d at 577. Specifically, in explaining the recently affirmed notion that "the insured can do that which cannot be done without his consent, and the insured may always grant to another a pecuniary interest in the insured's life even though the other has no insurable interest whatsoever in the insured," the *Burton* court explained:

> It necessarily follows that an insurer can incur no liability for increasing the risk to the life of the insured by issuing a policy designating as beneficiary a person with no insurable interest in the insured's life if the policy is procured with knowledge of and at the behest of the insured.

*Id.* at 578; *see also Crum*, 880 S.E.2d at 205. Therefore, since there was "no genuine controversy" over whether the deceased consented to the issuance of a $200,000 policy of life insurance on her life designating Adams as beneficiary, the *Burton* court declined appellants' invitation to circumvent those facts to find otherwise. *Id.* at 578.

30

The appellants in *Burton*, relying on *New England Life Ins. Co. v. Null*, 605 F.2d 421 (8th Cir. 1979), raised several defenses alleging that the insured was "merely a pawn" or an "innocent instrumentality" in a scheme by the beneficiary to obtain the proceeds under the policy through the insured's murder. *Id.* The *Burton* court rejected appellants' arguments stating first that "the legislature of this state has expressly provided that an individual may procure a policy of insurance on his life and name 'whomsoever he pleases' as beneficiary." *Id.* Therefore, the court explained, an insurance company could breach no common law or statutory duty by failing to inquire into the insured's motive or intent in applying for insurance and naming as beneficiary a person with no insurable interest. *Id.*

Second, the *Burton* court said that the deceased undisputedly executed the application for a policy of insurance in the amount of $200,000 on her life, and she undisputedly executed the change of beneficiary that made Adams the beneficiary under the policy. As such, the Court explained that "neither she nor can her estate" argue that she was not the party who in fact procured the insurance. *Id.* at 579. And, even assuming that the appellee breached a duty of reasonable care owed to the deceased in issuing the subject insurance contract, appellee's breach of that duty could not constitute the proximate cause of appellants' damage. *Id.* Thus, the court found that it was "her own actions" in applying for the insurance policy in question and designating Adams as beneficiary that increased the risk of danger

to her life. *Id.* And while the court did explicitly leave open the possibility that a third party may "cause" an insurance policy "to be procured upon another individual" by using the insured as an "innocent instrumentality" to purchase a life-insurance policy in which it has no insurable interest, it did not provide any further guidance on at that issue. *Id.*

More than 40 years later, the Supreme Court of Georgia had the opportunity to further explain Georgia's case law on this issue in *Crum* after the Eleventh Circuit certified two questions to it. 880 S.E.2d at 205 (Ga. 2022); *see also Jackson Nat'l Life Ins. Co. v. Crum*, 25 F.4th 854, 856–57 (11th Cir. 2022). There the issue was whether a person can legally take out an insurance policy on his own life with the intent to turn around and sell that policy to a third party who has no "insurable interest" in the policyholder's life.

In *Crum*, Kelly Couch applied for a $500,000 life insurance policy from Jackson National Life Insurance Company ("Jackson National") in 1999. 880 S.E.2d at 206. At the time Couch applied for the insurance, he knew that he was HIV-positive, which in 1999, meant that he had a diminished life expectancy. *Id.* He bought the policy with the intent to sell it on the secondary "viatical settlement market." *Id.* at 206 n.1 (explaining that the "viatical settlement market" is an arrangement in which a person, usually with a terminal illness, sells a life insurance policy to a third party for less than its mature value to obtain funds that

32

the insured can use while alive). After obtaining the relevant policy, Couch sold it to Sterling Crum, who bought Couch's insurance policy knowing that Couch likely only had a few years left to live. *Id.* Years after Couch died, Crum made a claim to Jackson National for the death benefit under Couch's policy. Jackson National denied the claim and filed a declaratory judgment action in this district court seeking a declaration that the policy was void ab initio under Georgia law as an illegal human-life wagering contract.

After a bench trial, the district court agreed with Jackson National that the policy was an illegal wagering contract and declared that the policy was void ab initio. *See Jackson Nat. Life Ins. Co. v. Crum*, No. 1:17-cv-03587-WMR, 2020 WL 12968089, at *9 (N.D. Ga. Mar. 2, 2020). Crum appealed to the Eleventh Circuit, contending that the district court erred in declaring the policy void ab initio based only on Couch's unilateral intent to sell the policy soon after he bought it. Specifically, Crum argued that Georgia law requires "the knowing and direct involvement of an identified third-party beneficiary at the time of the initial procurement of the policy" to find a policy void ab initio as an illegal wager on human life. *Jackson Nat'l Life Ins. Co.*, 25 F.4th at 856–57. The Eleventh Circuit, however, opined that Georgia case law did not definitively answer the question these arguments raised and so it certified the following questions to the Supreme Court of Georgia:

33

1. When an insured has purchased a life insurance policy with the intent to sell the policy to a third party with no insurable interest, must either the subsequent purchaser or an intermediary[] be complicit in the procurement of the policy before the latter can be deemed to be an illegal wagering contract and thus void ab initio?

2. If the answer to the above question is neither an absolute "Yes" or "No," but instead is a response that a life insurance policy can sometimes be deemed to constitute an unlawful wagering contract even without the complicity of the described third party, then we respectively [sic] seek further guidance as to the circumstances that determine when the policy is void ab initio and when it is not.

*Id.* at 863. The supreme court responded, holding that "under Georgia law, a life insurance policy taken out by the insured on his own life with the intent to sell the policy to a third party with no insurable interest, but without a third party's involvement when the policy was procured, is not void as an illegal wagering contract." *Crum*, 880 S.E.2d at 214. In a footnote, the court explained that implicit in the Eleventh Circuit's first certified question as originally posed is the suggestion that a policy would be void as an illegal wagering contract if, at the time the policy was procured, a third party was complicit in the procurement of the policy. *Id.* at 214 n.9. Returning to O.C.G.A. § 33-24-3(e) (1995), the court opined that would generally be true if the third party "caused" the insurer to procure a policy on his own life and name as beneficiary someone without an insurable

34

interest. The supreme court, however, elected not to go further and declined to respond to the second question. *Id.*

A year later, in *Sun Life Assistance Co. of Canada v. Bank of Utah*, another judge in this district had an opportunity to evaluate the circumstances underlying the creation of a life insurance policy suspected of being a STOLI. *Sun Life Assurance Co. of Can. v. Bank of Utah*, No. 1:21-cv-03973-LMM, 2023 WL 7449951 (N.D. Ga. Nov. 6, 2023). In that case, Sun Life Assurance Company ("Sun Life") sought summary judgment on its declaratory judgment claims that: (1) the policy was void ab initio as an illegal human-life-wagering contract, and (2) the policy was void ab initio because it was procured without a valid insurable interest at inception. *Id.* at *1. In a countercomplaint, Bank of Utah asserted class-action claims for common law breach of contract and unfair business practices under Chapter 93A of the General Laws of Massachusetts based on Sun Life's refusal to make a requested death-benefit change to the Policy. *Id.*

In holding that Sun Life could not prevail on summary judgment, the district court distinguished the case before it from *Crum*, explaining that the *Crum* court held only that a person could take out a policy on his own life with the intent to sell it, and that it said nothing on the question of how Georgia law defines "caused to be procured." *Id.* at *4. Instead, the district court relied on the *Burton* court's narrow reading of "caused" within the context of O.C.G.A. § 33-24-3(e). *Id.*

at 4 (citing *Burton*, 298 S.E.2d at 575). Specifically, the court said that the *Burton* court interpreted "caused" narrowly, holding that the policy at issue was not "caused to be procured upon another individual" because the insured herself "applied for and took all necessary steps to procure a policy of insurance on her life," regardless of her "motive and intent in so acting." *Id.* Though the district court again noted that a third party might "cause" an insurance policy to be procured upon another individual, the court said there was "ample evidence" in that case that the insured was not an innocent instrumentality, but instead "applied for and took all necessary steps to procure a policy of insurance on his life," such that it could not be said that a third party "caused the Policy to be procured upon him." *Id.* Considering that the insured "had decades of experience in the financial and real estate industries," was an "investor for several different companies involving residential and commercial real estate, finance, and sales," "signed the Policy application and other documents associated with a transaction," "submitted to a credit check," "provided financial and medical information to Sun Life in conjunction with the Policy application," and "signed a life settlement application in conjunction with the sale of the Policy," the court found that a reasonable jury could determine that no third party "procured" the Policy or "caused [it] to be procured" within the context of O.C.G.A. § 33-24-3(e). Further, Sun Life's contention that the loan documents showed that the lender was

the de facto purchaser and beneficiary of the Policy did not warrant an award of partial summary judgment in its favor. *Id.* There was also evidence that the insured, and not the lender, sold the Policy for a profit. As such, the court determined that there were still genuine issues of material fact and thus denied Sun Life's partial motion for summary judgment.

Notwithstanding the aforementioned cases, no Georgia case provides sufficient guidance on the question of whether an illegal wagering contract exists when a third party was complicit in the procurement of the policy. Nor have Georgia courts, in the context of stranger-originated life insurance policies, provided guidance on how to interpret "procured or caused to be procured" such that any court or party seeking to interpret the statute would be able to readily determine when a third party is complicit in the procurement of the policy. Because Georgia caselaw concerning illegal life wagering contracts does not address the legal standard governing such facts, the Court finds it necessary to certify certain questions to the Supreme Court of Georgia as set out below.[16]

---

[16] The Eleventh Circuit has had the opportunity to evaluate facts analogous to the facts here, but under Delaware law. *See Estate of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186, 1202 (11th Cir. 2021) (affirming the lower court's finding that the policy was an illegal STOLI policy lacking an insurable interest under Delaware law and certifying questions to the Supreme Court of Delaware to determine whether an entity that purchases a STOLI policy and holds the proceeds paid out on that policy following the insured's death can assert a UCC-based defense to a § 2704(b) claim to recover those proceeds). There, the court interpreted a "materially identical provision," prohibiting illegal human life wagering. *Crum*, 880 S.E.2d at

**D.      Questions to be Certified to the Supreme Court of Georgia**

Georgia law permits federal courts to certify questions of law to the Supreme Court of Georgia when "there are no clear controlling precedents," as to a question of law that is "determinative of the case"; the Supreme Court of Georgia is authorized to answer such questions by written opinion. O.C.G.A. § 15-2-9(a). The Eleventh Circuit has stated that certification is proper "[w]hen substantial doubt exists about the answer to a material state law question upon which the case turns." *Looney v. Moore*, 861 F.3d 1303, 1314 (11th Cir. 2017) (citation and quotation omitted). The Eleventh Circuit further advised courts to consider:

> the closeness of the question and the existence of sufficient sources of state law to allow a principled rather than conjectural conclusion. But also to be considered is the degree to which considerations of comity are relevant. And we must also take into account practical limitations of the certification process.

---

213 (citing *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank & Tr. Co.*, 28 S.3d 1059, 1076 (II) (E) (Del. 2011)("Price Dawe")); Del. Code Ann. tit. 18, § 2704(a). Like O.C.G.A. § 33-24-3, Delaware also requires that no person shall "procure or cause to be procured" any insurance contract upon the life or body of another individual unless the person has, at the time when such contract was made, an insurable interest in the individual insured. Del. Code Ann. tit. 18, § 2704(a). With the benefit of the clarity providing in *Price Dawe*, the Eleventh Circuit was able to evaluate questions similar to those faced by this Court here: (1) when a third party procures or causes to be procured a life insurance policy on another, (2) how to evaluate an insurance interest if a trust is a the beneficiary of a policy, and (3) when an arrangement between a third party and the insured appears to accomplish "indirectly" what law prohibits directly. *Estate of Malkin*, 998 F.3d at 1196. The Court seeks similar clarity here.

*See Royal Cap. Dev., LLC v. Md. Cas. Co.*, 659 F.3d 1050, 1055 (11th Cir. 2011) (quotation and alterations omitted).

For the reasons set out above, the Court finds that there is "substantial doubt" as to the controlling legal standard on the question of when a third party is complicit in the procurement of a policy. As such, the Court seeks guidance from the Supreme Court of Georgia on the following questions:

1. Can a life insurance policy be void as an illegal wagering contract if, at the time the policy was procured, a third party *was* complicit in the procurement of the policy?

2. If the answer to the first question is "Yes," under what circumstances would a third party be considered "complicit" such that it "procured or caused to be procured" a personal insurance contract upon another individual?

3. Can a life insurance policy be deemed to constitute an unlawful wagering contract if the complicity of the third party does not rise to the level of "procured or caused to be procured?" If so, then the Court respectfully seeks further guidance as to the circumstances that determine when the "complicity" of the third party rises to the level of violating Georgia public policy prohibiting illegal human life wagering and when it does not.

The Court also finds that the benefits of certification will outweigh any practical limitations of the process. Choosing to proceed without resolution of these issues will likely unduly delay the ultimate conclusion of this case. *See, e.g.,* *One Ga., Inc. v. Carr*, 599 F. Supp. 3d 1320, 1332 (N.D. Ga. 2022) ("Only a state supreme court can provide what we can be assured are 'correct' answers to state law question because a state's highest court is the one true and final arbiter of state law."). If the Court proceeds without review, the verdict is likely to proceed through a review process requiring consideration by the Eleventh Circuit and through certification therefrom to the Supreme Court of Georgia. *See, e.g., Polston v. Boomershine Pontiac-GMC Truck, Inc.*, 952 F.2d 1304, 1306 (11th Cir. 1992). Certification remedies this problem because it will cut out the middleman and prevent lengthy post-trial appeals. *See Cosper v. Ford Motor Co.*, No. 2:18-cv-189-RWS, 2023 WL 2374246, at *7 (N.D. Ga. Feb. 14, 2023).

## IV.  Conclusion

For the reasons stated herein, the Court certifies the three questions above to the Supreme Court of Georgia. The Court does not intend its phrasing of the questions to limit the Supreme Court of Georgia's consideration of the issues presented in this action. Therefore, the Court welcomes any restatement of the issues presented here in a manner that correlates with the answers it provides. The Court recognizes that many documents in the relevant record are sealed. If

requested, to assist in the consideration of the questions, the parties are authorized to send the entire record, along with the briefs, to the Supreme Court of Georgia in accordance with its rules, notwithstanding the protective order before this Court (Doc. 36). Until the Supreme Court of Georgia responds to the Court's questions, all relevant proceedings in this case are **STAYED**. Further, the Court hereby **ORDERS** that, for good cause shown, the documents (Docs. 97, 98, 100, 110, 114) sought to be filed under seal by both Wilmington Trust and Ameritas shall be filed under seal.

    **SO ORDERED** this 25th day of March, 2025.

Victoria Marie Calvert
United States District Judge